Filed 10/22/21  In re A.L. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

|  |  |
|---|---|
| In re A.L. et al., Persons Coming Under the Juvenile Court Law. | B309128 (Los Angeles County Super. Ct. No. 20CCJP02311A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. K.L. et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Julie Fox Blackshaw, Judge.  Affirmed.

Christine E. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant K.L.

Landon C. Villavaso, under appointment by the Court of Appeal, for Defendant and Appellant D.G.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephanie Jo Reagan, Principal Deputy County Counsel, for Plaintiff and Respondent.

---

Appellants K.L. (Mother) and D.G. (Father) contest the sufficiency of the evidence supporting the juvenile court's exercise of dependency jurisdiction. The court found that the children are at risk of serious harm from domestic violence. (Welf. & Inst. Code, § 300, subd. (b).)[1] Substantial evidence supports the finding. After an altercation in the home led to Father's arrest, Mother told police there were three prior violent incidents. Appellants later denied everything, minimize their behavior, do not acknowledge the deleterious effect domestic violence has on children, and allowed Father to violate a criminal protective order barring him from the home. Appellants' refusal to take responsibility for their conduct demonstrates a risk for future violence and supports jurisdiction. We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother has three children: A. (born in 2004), M. (2007), and D. (2017). Father is the presumed father of D. Father lives in Mother's home with A. and D. M. resides mostly with his father, G.O., who is not a party to this appeal.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

On March 1, 2020, Father was arrested for battery on an intimate partner. The police report states that he refused to allow officers into the home to investigate Mother's 911 call; Mother said they could enter but Father blocked the doorway. Additional officers called for backup convinced Father to allow them entry. Mother was very emotional. She said Father groped her while she was bathing. After she pushed him away, he "grabbed [her] by her hair and pulled her to her feet." She struck his face to get him to release her, whereupon he forcibly grabbed her arm, leaving visible bruises, yelled, and demeaned her. A. heard the ruckus and entered appellants' bedroom, where she saw Father grabbing Mother's arm. Father claimed Mother struck his face while trying to take D. from him. Mother was given an emergency protective order (EPO). The report states, "There have been 3 prior domestic violence occurrences between [appellants], but none have been reported." Mother told officers she did not report prior incidents because she feared retaliation.

Mother described the fight to a social worker (CSW) from respondent Los Angeles County Department of Children and Family Services (DCFS). She reiterated that Father groped her in the shower and pulled her hair; she reacted by striking his face. He then grabbed and bruised her arm. Mother said D. was present during the fight and repeatedly said, "no, mommy and daddy." Mother "admitted having [a] domestic violence history with [Father] that was not reported." Usually, they argue about his infidelity, without a physical fight. Father returned to Mother's home the day after his arrest, despite the EPO. They plan to stay together and not fight in front of the children.

Father told CSW that the altercation occurred while he was bathing D. Mother walked into the bathroom and struck his face

3

while trying to grab D. away from him, leaving a mark on his head.  He admittedly refused to leave the house at Mother's request and pulled her hair after she slapped him.  The argument continued until A. intervened.

Sixteen-year-old A. said appellants' near daily arguments make her "sad and mad."  She did not see the fight but saw Mother's bruises.  A. dislikes Father because he does not respect Mother.  Twelve-year-old M. was with his father, G.O., when the fight occurred at Mother's home.  M. has heard appellants argue but has never seen physical fights.  Two-year-old D. is too young to discuss her parents' relationship.

DCFS assessed the children as being at low risk for future neglect but worries about future exposure to Father's violence without DCFS intervention.  Mother did not report prior incidents of violence; she allowed Father to return to her home despite the EPO; she did not obtain a temporary restraining order; and appellants plan to stay together.  On the other hand, Mother called the police when Father attacked her; there are no prior police or DCFS reports; and appellants promise not to have physical fights and avoid having verbal disputes in the children's presence.  DCFS did not remove the children from the home.

On April 24, 2020, DCFS filed a petition alleging that appellants have a history of engaging in violent altercations in the children's presence, including one in which he forcefully pulled Mother to her feet by her hair, grabbed her arm and caused bruising.  Mother struck Father's face, leaving a mark. Father was arrested for battery and violated a criminal protective order prohibiting contact with Mother.  Mother failed to protect the children by letting Father live in her home with unlimited access to the children, placing them at risk of harm.  (§ 300,

4

subds. (a), (b).)  Appellants denied the allegations.  The court found a prima facie case that the children fall within section 300 and released them to appellants.

Family members were interviewed for the jurisdiction report.  A. said she usually stays in her room when she hears appellants arguing.  On this occasion, she yelled at them to stop arguing because she was trying to do her homework.  She did not see the altercation but saw Mother's bruised arm and Father's arrest.  Father returned home the day after his arrest and apologized to A.  Appellants said they "didn't want any more drama, but they still weren't speaking to each other."  Matters returned to normal and "[w]e're all fine now," according to A.  However, A.'s therapist said that A. has anxiety, panic symptoms, and depression; A. disclosed that appellants "often engage in verbal arguments."

M. was with his father, G.O., when the fight occurred.  Mother told M. about calling police but he does not know the details.  M. lives most of the time with G.O.

Mother denied the allegations.  She said appellants "had an argument.  I guess [Father] had gone out and had a couple of beers.  When he came home, I said something that I shouldn't have said.  It was about his infidelity. . . . He never pulled my hair and he didn't pull me to my feet.  He has never laid a hand on me in that way.  He did grab my arm as things began to escalate."  Mother said the mark on Father's head occurred when he "hit his head on the kitchen cabinet."  She denied causing the injury.  She called 911 "because I wanted him to leave."  D. was nearby and "she did start to cry when she heard me screaming."  A. came and took D. away.  Mother acknowledged having an EPO; nevertheless, Father came home after his arrest because

5

"This is my home and I didn't feel it was necessary for him to leave. . . . He isn't a threat to me or the kids." Mother feels DCFS should focus on other families.

Father denied any violent altercations. Instead, "[w]e had an argument about personal differences," a one-time incident that did not happen in front of the kids. "I never pulled [Mother's] hair or pulled her to her feet. I did grab her arm. She never hit me." He hit his head on a cabinet and lied to police when he told them Mother struck him. He did not read the EPO, so "[w]e were not aware that I was supposed to stay away from home." Father purchased a parenting book "to make things better." He urged CSW to focus on other families.

The maternal grandmother (MGM) opined that Father is a good man and a good provider who "simply made a bad decision." Mother told MGM that a verbal argument escalated into a physical altercation and she called police. MGM said appellants are extremely worried about DCFS involvement.

DCFS wrote that appellants are meeting the children's basic needs but have an unaddressed history of discord, engaging in verbal altercations that on at least one occasion escalated to a physical fight. Mother allowed Father to have unlimited access to the children, despite his recent arrest for battery and an EPO. He lacks insight into the effect his behavior has upon the children and must learn to resolve conflicts peacefully.

DCFS asked the court to sustain the petition. Appellants refused to participate in informal assessments by DCFS; they minimized the violence at home and its impact on the children; Father created a toxic home environment; Mother lacks insight about the cycle of violence in a household with children and allows Father to remain despite his aggressive behavior; A.

6

suffers from anxiety; M. chooses to live elsewhere; and D. requires constant care and attention at her tender age.

The petition was adjudicated on November 18, 2020. Appellants asked the court to dismiss the petition. Mother claimed they separated on March 1 with no plans to resume their relationship. Father pointed out that they have been under DCFS supervision for months while continuing to reside in the same home, "being open and honest about their plans to remain together and work on their relationship." He moved from the home in September. Appellants submitted certificates showing completion of an on-line domestic violence class in October; both certificates list Mother's home address. Minors' counsel joined with appellants and asked the court to dismiss the petition.

### The Court's Ruling

The court found that the altercation was as described in the police report at the time of the event. Later, appellants denied violent behavior. The court found the later denials not credible. The court observed that A. heard Mother screaming. When children are aware of violence in the home, they suffer emotional trauma. The court believed "that the statements that there has been previous violence are accurate." It was "very troubled by the parents' real failure to take much responsibility for this at all." Even if appellants currently live apart, their failure to obey the EPO and Mother's failure to obtain a restraining order led the court to believe they would reunite soon.

The court sustained the petition under section 300, subdivision (b). It refused Father's request to terminate jurisdiction and declared the children dependents of the court, finding it would be detrimental if the children are not subject to DCFS supervision. It allowed them to remain at home. DCFS

may accept programs appellants participated in, if properly accredited. Father must complete a program for batterers.

## DISCUSSION

Appellants challenge the sustained jurisdictional findings. We uphold the findings " 'if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

The sustained finding requires a showing that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ." (§ 300, subd. (b)(1).)

"[D]omestic violence in the same household where children are living *is* neglect; it is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it. Such neglect *causes* the risk." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194.)

" ' "Children can be 'put in a position of physical danger from [spousal] violence' [by], 'for example, . . . wander[ing] into the room where it was occurring and be[ing] accidentally hit by a thrown object, by a fist, arm, foot or leg . . . .' " ' " [Citation.] For that reason, a juvenile court may invoke jurisdiction under section 300, subdivision (b), even if a child has emerged physically unscathed from an instance of domestic violence." (*In re L.O.* (2021) 67 Cal.App.5th 227, 239 (*L.O.*); *In re R.C.* (2012) 210 Cal.App.4th 930, 943 [affirming jurisdiction even though the child who witnessed a violent altercation "was not physically

hurt"].)  Past violent behavior is the best predictor of future violence.  (*L.O.*, at p. 238.)

Our primary concern is a child's best interests.  Courts "need not wait for disaster to strike before asserting jurisdiction." (*In re K.B.* (2021) 59 Cal.App.5th 593, 603.)  As to D., age two when this proceeding began, special protection is given to "a child 'of such tender years that the absence of adequate supervision and care poses an inherent risk to [his or her] physical health and safety.' "  (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216, 1219 [children under the age of six at the time of the jurisdiction hearing are of "tender years"].)

Appellants contend that a single violent incident does not justify jurisdiction.  They fail to take the entire record into account.  The evidence shows appellants argue constantly; their contentious relationship makes A. "sad and mad."  It supports the court's finding of "previous violence."  Mother told police she did not report three prior incidents of violence because she feared retaliation.  In her first interview with DCFS, Mother admitted to an unreported history of violence.

As the proceeding progressed, appellants minimized their behavior.  Mother blamed herself, because "I said something I should not have said" about infidelity.  She contradicted prior statements.  She denied that Father pulled her to her feet by her hair, claiming "[h]e has never laid a hand on me in that way." Appellants said Father hit his head on a kitchen cabinet, though Mother told police, shortly after the fight, that she struck his face to get him to release her hair.  Likewise, appellants initially told CSW that Mother struck Father's face, and Mother told MGM she and Father had a physical fight.  The court disbelieved appellants' disavowal of statements they made to police and CSW soon after the altercation.  We do not reweigh its credibility determinations on appeal.

Appellants denied, in the jurisdiction report, that the children witnessed their fight. However, Mother told CSW that D. saw the altercation, repeatedly said, "no, mommy and daddy," and heard Mother "screaming." Father told police that Mother struck his face while he was holding D., creating a risk of serious harm to D. Appellants enlisted A. in their revisionist version of events. A. told police she entered appellants' bedroom when she heard fighting and saw Father grabbing Mother's arm. A. later denied seeing the altercation.

Appellants failed to coordinate their stories at adjudication. Mother claimed they separated after the altercation, with no plans to resume their relationship. By contrast, Father claimed they continued to reside in the same home and were "open and honest about their plans to remain together."

Assuming the truth of Father's claim that he went to stay with friends in September, before the jurisdiction hearing, this suggests a feint to avoid a sustained petition, not a sea-change in appellants' relationship. In any event, Father will have an ongoing relationship with his child, D. "Accordingly, Father will likely encounter Mother in [D.]'s presence in the foreseeable future." (*L.O., supra,* 67 Cal.App.5th at p. 240; *In re R.C., supra,* 210 Cal.App.4th at p. 940 [when parents have children together " '[t]hey're still going to be interacting with each other' "].)

Appellants' rewriting of the events of March 1, their refusal to openly address verbal abuse and physical violence with DCFS, and Father's disobedience of a criminal protective order all point to the need for dependency jurisdiction. "Father's failure even to acknowledge his past violent behavior, let alone express remorse or show any insight regarding it, exposes [the child] to a risk that he will once again attack Mother in [the child's] presence." (*L.O., supra,* 67 Cal.App.5th at p. 240.)

" '[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision' " (*In re A.F.* (2016) 3 Cal.App.5th 283, 293; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 601 [parent's denial of violence increases risk]; *In re K.B., supra,* 59 Cal.App.5th at p. 604 [court may "infer past conduct will continue where the parent denies there is a problem"].) It is immaterial that no fights were reported after police arrested Father and DCFS intervened. Appellants were under court and DCFS supervision before adjudication; they abstained from fighting and tried to rewrite their history to get rid of that supervision.

"One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) Appellants' main goal, as stated by appellants and MGM, is to avoid DCFS supervision. Substantial evidence supports the conclusion that they are unlikely to modify their behavior without supervision. (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044.)

## DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED.**


LUI, P. J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.

11